Filed 7/29/21  In re I.R.-A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.R.-A., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.W.,<br><br>    Defendant and Appellant. | A161259<br><br>(Solano County Super. Ct. No. J44928) |

Maternal grandmother D.W. appeals, in propria persona, from a juvenile court order denying her Welfare and Institutions Code section 388 petition seeking placement of I.R.-A. (minor) in her care.  We affirm.

1

The Solano County Health and Human Services Department (Department) filed a Welfare and Institutions Code section 300 petition,[2] after minor was born testing positive for methamphetamine. The petition alleged failure to protect (§ 300, subd. (b)(1)) due to parents "lengthy history of substance abuse" and mother's unmet mental health needs; no provision for support (§ 300, subd. (g)) because father's whereabouts were unknown; and abuse of a sibling (§ 300, subd. (j)) as mother had failed to reunify with four of her other children and father had failed to reunify with one of his other children.[3] Minor was placed with paternal grandparents "on an emergency basis." At that time, grandparents "expressed a desire to have the minor placed in their home with his biological half sibling" who they were also raising, and paternal grandmother informed the social worker she had been previously approved as a foster home in a different county. The

---

[1] Maternal grandmother's opening and reply briefs are not in compliance with the California Rules of Court. The opening brief does not contain citations to the record (Cal. Rules of Court, rule 8.204(a)(1)(C)); nor does it provide a summary of significant facts (*id*., rule 8.204(a)(2)(C)). We nevertheless shall overlook these deficiencies and address the merits. (*Id*., rule 8.204(e).) Additionally, her reply brief does not contain a proof of service (*id*., rules 8.212(a)(3), 8.200(a)(3), & 8.25(a)(1)). However, county counsel has informed the court it received a copy of the reply brief. Finally, we disregard the T-Mobile cell phone bill attached in the middle of grandmother's reply brief.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] Mother's other children had been placed with maternal grandmother, while one of father's children had been placed with paternal grandparents. Neither mother nor father are parties to this appeal.

grandparents were "moving towards completion of the Relative Family Approval process" at the time of the detention report.

The court ordered minor detained, services for mother, and visitation for mother and father, and set the matter for a jurisdiction/disposition hearing. Additionally, although father remained an "alleged father," the court found minor was placed in an approved home of a relative and that paternal grandparents were "able, approved, and willing to care for the child."

A month later, maternal grandmother filed a section 388 petition seeking placement of minor. She stated she found out about minor's removal "not by formal notification from CPS but by multiple calls and emails to CPS" and that she was "not proper[l]y considered" for Resource Family Approval due to a mix-up with her address. She urged the court to place minor with her because she had adopted four of his biological siblings, at least one of whom was a "full blood sibling, if DNA confirms father." Further, she maintained placement with her would be "better for the child" because she had "services and therapies for older siblings and providers" in place.

At the combined hearing on maternal grandmother's petition and the jurisdiction and disposition hearing, the court continued the matter pending the paternity test results. At the continued hearing, counsel for the Department informed the court the paternity testing had been completed the week before the hearing but because of "the COVID-19 situation," the "turn-around" time for the results were about "three weeks or so." Maternal grandmother's counsel stated, "If we know that the paternity testing is not going to be ready . . . we won't be ready to proceed with the 388. [¶] I don't know what the posture of the Court is. If the paternity test is going to be dispositive, then obviously we need the test. If there are other issues that

have nothing to do with the actual paternity test, then I think we could go forward." After all counsel indicated they had no objection, the court proceeded with the jurisdiction[4] and disposition hearings[5] and continued the hearing on maternal grandmother's petition.

In the meantime, after a hearing on the matter, the court declared father the "biological father" of minor, and the Department prepared a response to maternal grandmother's section 388 petition for placement. The Department stated that "Due to a clerical error and the slowdown of some procedural tasks due to COVID-19, the relative notifications for [maternal grandmother] were generated, but not mailed within thirty (30) days of removal." However, despite the error, maternal grandmother contacted the Department and began visiting minor within 30 days of his removal.

The Department detailed the problems with grandmother's Resource Family Approval. After lengthy "delays,"[6] maternal grandmother had been

---

[4] The court found by a preponderance of the evidence the allegations set forth in the petition were true, sustained the petition, and determined minor was a child described in section 300, subdivisions (b), (g), and (j).

[5] The court adjudged minor to be a dependent of the court, found by "clear and convincing evidence of the circumstances set forth in Welfare and Institutions Code section 361, subdivision (c) . . . (1), with regard to the mother and the alleged father" and are persons described by section 361, subdivision (b)(10), that "[r]easonable efforts were made to prevent or eliminate the need for removal of the child from the home," and that continuance in the home is contrary to minor's welfare. The court denied or by-passed reunification services and set the matter for a section 366.26 hearing to select the a permanent plan for minor.

[6] The delays were caused by "concerns" with maternal grandmother such as her presenting as "guarded and protective of information that is standard in the process," grandmother's filing of complaints "when asked questions she found too personal," and concerns about maternal step-grandfather's "past allegations of physical abuse and sexual misconduct."

4

"conditionally approved as a child specific" home in June 2019. This meant maternal grandmother's home "would require further assessment for a capacity increase and approval to include another child." The Department noted maternal grandmother's Resource Family Approval initially showed as "inactive" because she had moved but it was "active" at the time of minor's birth. Besides only being approved as a child-specific home, grandmother's move necessitated a transfer of her resource family approval to Sutter County. However, that county was unwilling "to accept the transfer . . . , as from reviewing the home study and application, they would not have approved the home, if it had been assessed by their county." In addition, as of the writing of the report (August 2020) grandmother's home was "no longer in approval status," since the annual renewal date for her approval was in June 2020. A month before the deadline, the social worker had completed the home visit and necessary interviews and had drafted the renewal report, which she expected it "to be finalized within the next two (2) weeks."

In contrast, at the time of minor's birth, paternal grandparents' Resource Family Approval "was active and had an available bed for one (1)." Although it was not necessary, a capacity increase was still submitted in April 2020 and granted the following month "for an increased capacity of two." Their renewal was due in August 2020, which "should be completed soon, as their interviews have been completed."

The Department recommended the trial court deny maternal grandmother's petition and that minor remain with his paternal grandparents. Minor had been in his current placement since birth, it had since been determined father was the "biological father" of minor, and paternal grandparents had guardianship over minor's half-sibling. They had an "active Resource Family Approval home status." Furthermore, mother

5

preferred placement with paternal grandparents, expressing concerns with maternal grandmother's home and that mother was " 'really not ok with my other kids being there.' " Finally, the Department was concerned about minor's opportunity to "have meaningful connections" with his paternal family, "as historically [maternal grandparents] have demonstrated significant barriers and an unwillingness to encourage familial relationships." For example, paternal grandparents had requested to see minor's sibling, who was in maternal grandparents' care, every three or four months but maternal grandmother only agreed to allow the "paternal half-sibling to write to [her sibling] until she turned eighteen (18) years old, and there was no offer for visits for them." Maternal grandmother asserted she was "now open to maintaining connections with the paternal family, but she will not allow for the paternal grandfather to 'control it.' "

At the continued hearing on the petition for placement, the court heard from maternal grandmother and the social worker.[7]

Grandmother explained she had custody of four of mother's children, including at least one "full sibling" of minor. The children ranged in age from two to nine. She stated her Resource Family Approval status was still good

_____

[7] The trial court also heard from an expert in "child development as it relates to Title 9" on behalf of maternal grandmother. The expert, who was the "in-home play-based therapist" for maternal grandmother's youngest adopted child, testified about the "special needs" a child who has "been drug exposed" in utero may have. Although he stated there would be a "benefit to a child who had been drug exposed in utero to being raised in a home where people," such as maternal grandmother, were "knowledgeable about this issue," "anybody," including paternal grandparents could "learn the skills necessary to parent" minor. Additionally, he had no personal knowledge about the situation involving minor, had never met paternal grandparents, never met minor, and had only learned of minor's situation through maternal grandmother.

upon minor's birth, and as she understood it, until a determination on her renewal had been made, she was still approved in Solano County where her prior approval had been. She admitted she learned of minor's birth within 30 days of his birth, but only after she e-mailed the Department seeking information. She asserted she could provide all of her grandchildren a good home, that she "purposely bought a bigger house than I ever thought I'd own so that we'd have plenty of space, because my daughter is going to, at least in the foreseeable future, continue to have children," and that she knew she could not "take all of them." She stated, "I know at some point they'll say, 'Oh, I'm sorry, you have eight. That's too many.' I understand that, but I want to keep them all together." She visited minor once a week for an hour, and there had also been family visitation once a week.

She maintained, three of her four children had "post in utero exposure disorders," and that she had "learned everything" and had "therapies in place. We see all the same specialists for all the kids, so that if something new pops up, the specialist can be on top of it." She thought she should have minor over paternal grandparents because one of her children, at age two, was closer to his age. Maternal grandmother also expressed that minor's initial placement was not fair and she would like to have been called first for placement.

As for past visitation between minor's sibling currently placed with her and minor's half-sibling currently placed with paternal grandparents, maternal grandmother clarified that she made three visitation offers: "The first one was [for] letters for the first year and then re-visit face-to-face visits. The second one was just letters and pictures. The third one was nothing until [the half-sibling] was 18, and at that point she could reach out and . . . we could work out something when she was 18." In follow-up questions from

7

the court regarding her position on visitation between paternal family and minor's sibling, grandmother stressed that she only asked for a year of "no in-person visitation" between them because she "wanted to have one focus at a time" and might be "exhausted on the weekend" trying to "get our lives together."

The social worker explained that although maternal grandmother did not feel minor's initial placement was "fair," mother had initiated the arrangements. Mother had been in contact with paternal grandparents, throughout her pregnancy. And, mother, knowing minor would likely "also be taken into protective custody" at birth, asked paternal grandparents if they would be "willing to care for him." They agreed, and when mother went into labor, she called paternal grandparents so they would be present with minor when the emergency response social worker came to investigate.

As to maternal grandmother, the social worker explained that although at the time of minor's birth, maternal grandmother's Resource Family approval was "in status,"[8] she had only been approved as a "resource family home with a child-specific approval" for minor's sibling.[9] As such, even

---

[8] "[I]n-status resource approval would mean that they're in approval for that year. So every year, an open resource family home has the option to then go through the annual renewal. . . . It's a shorter approval process than what it would be in the general approval, but it's the check on the status of the home, about whether or not any concerns have come up. And then another secondary report would be written to then re-approve the home for annual renewal."

[9] A "child-specific placement happens when there may be some concerns that come up during the resource family approval process, but there are concerns about the applicant or that home's ability to provide care to the general population of kids that we serve; that while there's a worry for the general population, there may not necessarily be so much of a worry for their relative, so we would want that home to be approved simply for that child."

though grandmother's approval remained open "it was still only approved for [minor's sibling.]" If mother had another child, as happened here, then "there would still need to be an approval, because we now have a different child than the one that the home was approved for, but the approval process is shorter." The social worker went on to explain the additional problems with maternal grandmother's approval: After grandmother moved, Solano County attempted to transfer her approval to Sutter County but they did not "accept" the transfer because the Resource Family Approval supervisor "did not feel comfortable in monitoring the home and completing the annual re-approvals" because of "concerns that were present within the written report" during the original approval process, which Sutter County "would not have approved" in the first place. At the time of the hearing, grandmother's approval was "out of status, in the sense that it's not an active home because there's not been the annual approval. And the RFA unit is still determining about what they are going to do about the approval process."

In any event, the social worker explained, even if her home was approved, the Department would not recommend placement with maternal grandmother because of the "numerous concerns" expressed during minor's sibling's case such as her changing the sibling's name because she felt his parents would not be successful in reunification and "despite the department informing her that that was not his legal name and that that would be seen as a violation of his rights to do that." There were also "concerns about her ability to . . . ensur[e] that visitations were happening with the paternal family," as "there were incidents of barriers being placed" and "concerns historically about her ability to work the department" and the paternal family. For example, the social worker relayed an incident in which minor was sick and maternal grandmother stated she knew why he was sick but

9

initially refused to explain because she wanted the paternal family "to figure it out on their own" and she preferred to handle minor's sickness once he "was in her care." After repeated inquiries by the social worker, grandmother finally "expressed that the maternal family has a history of lactose intolerance, and children in the maternal family have typically been on soy formula."

After testimony, the trial court heard from counsel. Maternal grandmother's counsel urged the court to place minor with grandmother because it was "in the child's best interest to be with the siblings that are closer in age," and that she had experience "dealing with these children that might have problems due to drug exposure." County counsel, joined by minor's counsel and mother's counsel, urged the court to deny maternal grandmother's petition "for a myriad of reasons," including that (1) although grandmother felt "entitled to placement of any child born to her daughter," her home had not received Resource Family Approval; (2) even if her home had been approved the Department recommended against placement because she had not demonstrated a willingness to "facilitate familial contact" between minor and paternal family as evidenced by her past behavior with minor's sibling; (3) her own testimony about how "overwhelmed she is with all of [the children's] appointments and her job . . . such that she couldn't possibly facilitate even monthly visitation for [minor's sibling] and his paternal grandparents"; and (4) the concern that minor's needs might not be met given her "violations of [minor's sibling's] personal rights" in changing his name and cutting off "on-going familial contact." Further, minor had been with paternal grandparents since birth, had bonded with them, he was placed in the home of his half-sibling, and the paternal grandparents had been able to maintain contact with maternal family.

The trial court began by noting "there is a basic problem," that maternal grandmother's "home is not RFA approved" and rather was only child-specific as to minor's sibling. The court also found it "extremely concerning that Sutter County, upon looking at the previous specific approval . . . is unwilling . . . to accept a transfer," "essentially saying that they wouldn't have approved her in the first place." The court noted this would, "normally take care of this entire" matter because grandmother had not met her burden. However, the court felt "compelled to go one step further" and determined the Department's placement with paternal grandparents was appropriate. The paternal grandparents had had minor since birth, minor was doing well and "has bonded" with them.

Finally, even though maternal grandmother was "fully and completely qualified to have the care of this child" and had "children of similar ages, one a full-blooded sibling . . . and the other half-siblings," the court determined placement with maternal grandmother would be inappropriate because it was clear to the court "she's got her hands full." Grandmother worked full time, commuted 45 minutes to and from work, and had "four special-needs children" at home. Adding in the care of minor, "frankly, . . . would be overwhelming." Additionally, the court addressed "the troublesome issue of contact" and visitation, stating paternal family was "in a far superior position to facilitate frequent and continuing meaningful contact between [minor] and his other siblings," and it was "pretty clear" maternal grandmother "is not in that position."

The court denied the petition and set the matter for a section 366.26 hearing.

11

On appeal, maternal grandmother challenges the denial of her section 388 petition on three grounds:  because (1) the Department failed to notify her within 30 days of minor's removal as required by statute; (2) the trial court erred in basing its determination on her Resource Family Approval status; and (3) the court failed to comply with section 361.3.[10]

***Notice***

Grandmother maintains "[n]otifications to the grandparents and siblings of the minor are to be placed in writing within 30 days" pursuant to section 309, and here, her notification came "almost 60 days after removal." She asserts that had "the Department complied with its duties to notify and promptly assess relatives in this case, [minor] may never have even been placed" with paternal grandparents.

Section 309, subdivision (e)(1)(A), (B) provides, "If the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all grandparents, parents of a sibling of the child, if the parent has legal custody of the sibling. . . .  The social worker shall provide to all adult relatives who are located . . . , within 30 days of removal of the child, written notification and shall also, whenever appropriate, provide oral notification, in person or by telephone" that the child has been removed from his or her parent and an "explanation of the various options to participate in the care and placement of the child."

---

[10] To the extent grandmother asserts minor's rights were violated by his placement with paternal grandparents and not with her and his siblings, she has not supported that contention with argument or legal authority.  It is therefore waived.  (*In re A.C.* (2017) 13 Cal.App.5th 661, 672 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].)

Here, the social worker stated, "Due to a clerical error and the slowdown of some procedural tasks due to COVID-19, the relative notifications for [maternal grandmother] were generated, but not mailed within thirty (30) days of removal." However, maternal grandmother contacted the Department and began visiting minor within 30 days of his removal. Given this, grandmother does not say how she was harmed by the lack of notification.

While she maintains she "could have been an option at the time he was placed in the concurrent planning home post-disposition," her counsel stated she had no objection to the court handling jurisdiction and disposition and continuing the section 388 evidentiary hearing until paternity had been determined. Counsel stated, "If we know that the paternity test is not going to be ready . . . we won't be ready to proceed with the 388. [¶] I don't know what the posture of the Court is. If the paternity test is going to be dispositive, then obviously we need the test. If there are other issues that have nothing to do with the actual paternity test, then I think we could go forward." Thus, as the Department notes, counsel made a "strategic" choice to move forward with disposition before addressing placement.

The Department placed minor with paternal grandparents on an emergency basis. Paternal grandparents also had an active and open Resource Family Approval, while grandmother had only been approved as a child-specific home and required further assessment. Thus, even though the Department failed to notify grandmother within 30 days, she has not shown any harm.

**Resource Family Approval**

The resource family approval process is intended to be an expedited assessment of an individual's or family's ability to provide care for and

13

become a legal guardian or an adoptive family for dependent children. (§ 16519.5, subd. (a).) A resource family is "an individual or family that has been successfully met both the home environment assessment standards and the permanency assessment criteria . . . necessary for providing care for a child placed by a public . . . agency by court order, or voluntarily placed by a parent or legal guardian." (*Id.*, subd. (c)(1).) "[A] county may approve a resource family to care for a specific child." (*Id.*, subd. (c)(4)(B)(i).)

Grandmother makes no argument as to her approval, rather she asserts the trial court erred because her approval was "merely in yearly review," not "denied."[11]

The trial court did not state grandmother's approval had been denied. Rather, it stated the "basic problem" was that her home had only been approved for minor's sibling, and "that approval really is moot anyway, because [the sibling had] been adopted. There is no RFA approval for any other child, whether [minor] or anybody else." Additionally, as the social worker noted, that approval, even if it had not been moot, was no longer "in-status" because the deadline for her review had passed. Finally, although the Department was working on further assessing grandmother to add-in another child, there were unexpected delays because Sutter County had refused to accept any transfer, and the Department was in the process of reviewing what to do about that determination.

Thus, at the time of the evidentiary hearing grandmother did not have an open resource family approval, and the trial court did not err in its finding.

---

[11] Effective June 29, 2021, the Legislature changed the review process from an "annual basis" to a "biennial basis." (See former § 16519.5, amended Stats. 2020, ch. 11, § 76 (Assem. Bill No. 79 (2019-2020 Reg. Sess.)), effective June 29, 2020, operative January 1, 2021.

### Section 361.3 Factors

In any event, even assuming grandmother had an open and general resource family approval, the approval only gives relatives of dependent children "preferential consideration" for placement. (§ 361.3, subd. (a).) The preference applies at the dispositional hearing and, after that time, "whenever a new placement of the child must be made." (*Id.*, subd. (d).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated," (*id.* subd. (c)(1)), approval does not, however, guarantee that the court will place the child with the approved relative. (§ 16519.5, subd. (c)(6) [approval "does not guarantee an initial, continued, or adoptive placement of a child with [the] resource family"]; *In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.)

Rather, when determining whether a child should be placed with a relative, the court must consider the nonexhaustive list of factors set for in section 361.3, subdivision (a), the most important of which is the best interest of the minor. (§ 361.3, subd. (a)(1)-(8); *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863 (*Alicia B.*) ["linchpin of a section 361.3 analysis" is minor's best interest].) In short, the child's best interests may trump a relative's placement request under section 361.3. (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.)

Among the other factors the court must consider are the wishes of the various parties, including the children and the parents; the duration and nature of the relationship between the child and the relative; placement of siblings and half siblings in the same house; the ability of the relative to facilitate visitation with the child's other relatives; and whether the relative can meet the needs of the child by providing a safe and stable placement. (*Alicia B., supra*, 116 Cal.App.4th at p. 862, fn. 6.)

We review the dependency court's placement decision for an abuse of discretion. (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1060, superseded on other grounds as stated in *Cesar v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032.) We therefore must defer to the trial court unless, viewing the evidence most favorably in support of the court's decision, we conclude no reasonable judge could have made the order. (*Alicia B., supra*, 116 Cal.App.4th at p. 863.)

The trial court did not abuse its discretion when it declined to place minor with maternal grandmother. Initially, we note that, "Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period. [Citations.] During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 795.) However, by the time of the section 388 hearing, reunification services had been bypassed or terminated meaning the section 361.3 preference no longer applied. Although maternal grandmother filed her petition before the disposition hearing, her counsel decided to wait for the paternity testing rather than determine placement at the combined jurisdiction, disposition and section 388 hearing.

Any reliance on *In re R.T.* (2015) 232 Cal.App.4th 1284 (*R.T.*) and *In re Isabella G.* (2016) 246 Cal.App.4th 708 (*Isabella G.*) is misplaced.

*R.T.* involved the deliberate and willful refusal by the child protective services agency to consider relatives for placement, unreasonable delay by the juvenile court in deciding the relatives' motion seeking placement, and the court's legally incorrect determination that section 361.3 did not apply because the dispositional phase of the case had passed. (*R.T., supra*,

16

232 Cal.App.4th at pp. 1293-1295.) The Court of Appeal reversed, holding the agency and the court erred. (*Id.* at pp. 1297-1300, 1309.)

In *Isabella G.*, the social services agency repeatedly ignored and then delayed the grandparents' numerous requests for placement of the minor with them during the proceedings. (*Isabella G., supra,* 246 Cal.App.4th at pp. 712-715.) After the court set a section 366.26 hearing, the grandparents filed a section 388. (*Isabella G.*, at p. 715.) The juvenile court denied the petition, concluding the section 361.3 relative placement preference no longer applied because reunification services had already been terminated and the best interest of the minor would be better served by adoption by the nonrelative family member to whom she had bonded. (*Isabella G.*, at pp. 717-718.) The Court of Appeal reversed holding "when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3 without having to file a section 388 petition." (*Id.* at p. 712.)

Here, within a month of minor's birth the social worker had "submitted a request for a capacity increase for [maternal grandmother]" because grandmother's home required "further assessment" because her home had been "approved as a child-specific" home to be used only for minor's sibling. Due to "COVID-19 precautions, CDSS authorized for renewals to be delayed," but the social worker was able to complete the home visit and necessary interviews for grandmother's resource family approval renewal by June 2020. It was not the Agency's delay but rather the new county's concerns that caused grandmother's application to be held up. As explained at the hearing, Sutter County had refused to renew her application because of concerns they had over the initial child-specific approval. Additionally, there were no

17

unreasonable delays in the hearing. Instead, grandmother's counsel joined in to continue her evidentiary hearing and move forward with the jurisdiction and disposition hearings pending the paternity results. Finally, the court did not determine section 361.3 did not apply but rather assessed both sets of grandparents for placement.

Although the juvenile court never expressly referred to section 361.3, our review of the record establishes the court considered the factors listed in that section when determining if the agency's placement decision was appropriate.

The court was understandably concerned with the impact a fifth child would have on grandmother's ability to provide for minor. (§ 361.3, subd. (a)(7)(A) ["[p]rovide a safe, secure, and stable environment for the child"] & (a)(7)(B) ["[e]xercise proper and effective care and control of the child"].) Given grandmother's "own testimony," the court stated it was "pretty clear . . . that she's got her hands full. She's working full time, commuting 45 minutes to and from work, and with four other special-needs children at home. To care for [minor], who is, what, six months old at this point, frankly, I think that it would be overwhelming."

The court also discussed "the troublesome issue of contact, visitation for this family" and grandmother's ability to maintain visitation with paternal family (§ 361.3, subd. (a)(7)(F) ["[f]acilitate visitation with the child's other relatives"]), and determined paternal grandparents were "in a far superior position to facilitate frequent and continuing meaningful contact between this child and his other siblings." Additionally, despite grandmother's assertion that she had minor's siblings placed with her, paternal grandparents also had minor's half-sibling (§ 361.3, subd. (a)(4) ["[p]lacement of siblings and half siblings in the same home"]). Finally, the court noted

18

paternal grandparents had minor since birth, and he was "doing quite well and has bonded" with paternal grandparents (§ 316.3, subd. (a)(6) ["[t]he nature and duration of the relationship between the child and the relative"]).

Grandmother asserts the "children's placement and bonds with caretakers cannot be dispositive as to their best interests." As explained above, the trial court did not rely solely on minor and paternal grandparents' bond, and indeed the court focused more on grandmother's own testimony.

She asserts she was entitled to placement because she is a "relative within the one degree of kinship to the child[]" and placement with her would allow for minor to be "in the same home" as his "full brothers and sisters." While this is true, paternal grandparents are also within "one degree of kinship to minor" and both placements allowed minor to be with siblings, as paternal grandparents had minor's half sibling placed with them. She further asserts the trial court erred in placing minor with his " 'alleged' paternal grandparents and one 'alleged' half sibling," since paternity had not been established at the time of the placement." As noted above, minor was placed with paternal grandparents on an "emergency basis" and the hearing on placement was continued at grandmother's counsel's urging until paternity could be established. Having been established, both sets of grandparents were equally assessed by the court at the time of the section 388 hearing.

In conclusion, the court did not abuse its discretion in denying maternal grandmother's section 388 petition.

## DISPOSITION

The order is affirmed.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.

A161259, In re DW